## Brown v. Commonwealth.

May 17, 1949.

George I. Cline for appellant.

A. E. Funk, Attorney General, Walter C. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HELM—Affirming.

The appellant, Orville Brown, charged with killing Eddie Johnson, was convicted and sentenced to life imprisonment. He appeals from that judgment.

About 11 a. m. on Sunday, June 11, 1947, Eddie Johnson was assassinated in his grocery store on the Morehead-Sandy Hook road in Rowan County by a masked gunman. Bobbie Rowe, Eddie Johnson, Arnold Johnson, Carl Maze and Farmer (Tootie) Pennington were in the store when the gunman appeared at the front door. The gunman had a double barrel shotgun in his hands and a "poke, * * * a white looking * * * cloth sack over his face, with eyeholes in it", extending "about to the shoulders." As he came in the door, he said, "Nobody move" and "Come out from behind the counter, I mean you over there." The Rowe boy said, "You are kidding somebody. * * * Quit acting a fool." The gunman shot Rowe in the side and immediately shot Eddie Johnson. Rowe fell to the floor and Johnson fell behind the counter. Neither Rowe nor Johnson was armed. They both died shortly after they were shot. After the shooting, the gunman "turned around and walked out * * * stepped right out" and disappeared.

Sam Greene, sheriff of Rowan County, went to the Johnson store as soon as he learned of the tragedy. He found the Rowe boy and Eddie Johnson, a man about fifty years of age, both dead. From the shotgun wadding, he judged that the weapon used in killing them was a twelve gauge shotgun. He found tracks leading away from the store, going east into the brush, and found signs between the old and the new roadbed, a hundred or two hundred feet from the store, where

"somebody had been laying * * * in a clump of bushes." He found only one set of footprints there. The front door of the store could be seen from that point.

Mrs. Arnold Johnson saw Orville Brown around 8:30 the night of June 10, 1947, at her home. She says she and her husband were in bed; that Orville Brown came in, went to the kitchen and got a drink, went back to the front porch and talked with her husband; that Orville, speaking of Eddie Johnson, said, "I have got a man to talk to. My father is seventy-six years old. Nobody can run over my father and get by with it;" that when Orville asked, "How many indictments did he get?" Arnold said, "Three or four;" that Orville asked, "Have you got a shotgun?" and "Then you wouldn't have any shells;" that Arnold said, "I have got one, size 7½" and Orville said, "That is too fine;" that Orville, as he started to leave, said, "Arnold, don't mention seeing me;" that she had known Orville Brown for several years but had not seen him for three or four months before that night.

Cleo Caudill, single, twenty-one years old, had been acquainted with Orville Brown eight or ten years and lived about a half mile from his home. He said that Orville had been away but had returned a day or so before the killing; that Orville Brown was at his father's home on June 10; that Orville said he heard Eddie Johnson had a warrant in his possession for him, that "he would whip him or kill him if he had to. * * * Orville said he wanted to borrow a gun * * * a pistol. * * * Said he was aiming to have a talk with Eddie Johnson. * * * Orville's house was about six or seven hundred yards from where Eddie Johnson lived." After the witness and Orville left Arnold Johnson's home, they went to Orville's house. When Orville came out, Caudill says, "he had a blanket and I think a shotgun wrapped up. It looked like a double barrel. * * * Orville told him he had three or four shells. * * * He said he was go'ng to have a talk with Eddie Johnson and he would kill him if he had to."

There were four eyewitnesses to the double killing.

Russell Lowe of Sandy Gap, Elliott County, eighteen years of age, says he heard the man who killed Eddie Johnson speak when he came in the store; that he

"thought it was Orville Brown, it sounded like his voice;" that the gunman had on a pair of overalls and a gray looking shirt. He stated that he couldn't tell the jury that he knew it was Orville Brown, but that from his voice and appearance, it was his best judgment that it was Orville Brown.

Carl Wallace Maze, twenty-four years old, of Sandy Hook, had known Orville Brown for about a year and a half. He saw Orville Brown at Ashland on June 10. He went to Eddie Johnson's store about 11 a. m., June 11, says he had been at the store about ten minutes when a masked man stepped in the door and said, "Nobody move;" that Rowe said, "You are kidding somebody. Don't be acting the fool;" that the gunman shot him and shot Eddie Johnson. Maze said that the gunman spoke in a low voice; that to his best knowledge it was the voice of Orville Brown.

Arnold Johnson, living at Newfoundland in the edge of Elliott County, had known Orville Brown all his life and had seen him often. They were boys together. He saw Orville Brown at his home the night before the killing. Orville was trying to borrow a gun, a pistol. Orville told him that Eddie Johnson had three or four warrants for him. Orville asked him not to tell anyone that he had been there, said that nobody knew he was in the country, not even his father and mother. Arnold Johnson went to Eddie Johnson's store the next morning. Carl Maze, Bobbie Rowe, Tootie Pennington, Russell Lowe and Eddie Johnson were there. He was talking to Eddie about buying pork and beans, when he heard a voice say, "Nobody move." He recognized the voice as that of Orville Brown. Eddie Johnson was behind the counter. Brown said, "Come out from behind the counter. I mean you over there." Brown had a shotgun. Brown shot the Rowe boy. Arnold says he ducked and the gun fired again. He heard Eddie Johnson fall behind the counter. The shots were fired fast. After firing the shots, Brown wheeled and went out. Brown had a "poke", a white looking cloth sack over his head and face, down to his shoulders. There were eyeholes in it. The sack fit tight. Arnold Johnson testified that he knew Orville because he "stands erect, with his shoulders thrown back a right smart. More than anybody

else;" that he also knew "it was Orville Brown by his voice." Orville was wearing overall pants and a gray shirt. A person at Orville Brown's home could see Eddie Johnson coming to and leaving his store.

Orville Brown's defense was an alibi. He stated that he lived about four hundred yards from Eddie Johnson's store; that he had been in Indiana working at a factory; that he came home the day before Eddie Johnson was killed. He stated that he did not try to borrow a gun from Arnold Johnson. He said that he went with Cleo Caudill to get an iron pipe from Arnold Johnson; that he didn't have any; that they returned to his home, where he let Cleo have an iron pipe. When asked what the pipe was for, he said, "Aimed to use that in making whiskey in a still." Orville says that he went to the home of his father, Tom Press Brown, the next morning before nine o'clock; that his mother was putting a rug down in the kitchen; that he helped her; that Carl Thomas was there and helped put down the rug; that Tootie Pennington was out on the porch with his father; that while he was in the kitchen he heard two shots fired; that after the shots were fired, Arnold Johnston stopped in front of the house and told his father that someone had killed Eddie Johnson and Bobbie Rowe; that his father or mother asked who did it and he said he didn't know. Orville says he left the house right after that with Carl Thomas; that Carl Thomas wanted some whiskey; that they went back of the house "in the woods and a growed up field;" that one purpose "I had was that I had this whiskey for Carl hid out there;" that it was government whiskey he had got the latter part of the winter; that he sold two bottles of the whiskey to Carl. Orville states that he did not return to his father's home; that he heard some time later that he had been accused of the crime; that he heard the feeling was pretty high and that threats had been made; that he was scared and thought he would wait until it was safe to come out; that he came in and gave himself up about a month later. When asked if he went to Eddie Johnson's place after he heard that Eddie and the Rowe boy were killed, he said, "I had no business out there. I heard they had some warrants for me. I knew the law would be there in a short while. I didn't want to be picked up." He stated that he had known

Eddie Johnson for eight or ten years; that he had heard that Johnson had gone before the grand jury and caused an indictment to be returned against him. He stated that he did not return to his father's or his home but "stayed out." He had known the officers were looking for him. He received this information through friends. When asked to name them, he replied, "I won't tell any names." When admonished by the court to answer who it was, he replied, "I talked to my wife." When asked if anyone else told him the officers were looking for him, he replied, "I am not telling. I am not calling any other names." When asked by the court, "Do you refuse to answer the question?" he replied, "yes." He learned that the officers were also looking for him in other states. During all of that time he was out in the woods and cliffs.

Orville was asked to read a letter of June 1, 1947, he had written his wife from Indiana. In it he wrote, "I will try to take care of Edd. I don't want to do anything more than give him a good beating. I guess that I may have to sell out and leave anyway, so I will give him something to remember me by."

Carl Thomas testified that on the day Eddie Johnson was killed, he went to Tom Press Brown's to get some whiskey; that he and Orville were together in the kitchen when they heard two shots fired.

Farmer (Tootie) Pennington, testifying for defendant, said, "We was all in the store. Some man walked in and ordered us not to move. He had a mask over his face. The boy moved. He shot him and shot Eddie and was gone." He stated that in his opinion, based upon his knowledge of Orville Brown's voice, build and size, that the man who did the killing was not Orville Brown. On cross-examination, when asked what relation he was to Orville Brown, he replied, "None that I know of." Pennington stated that he had seen Orville Brown at his father's home shortly before the killing. On cross-examination he testified that after the killing he told the sheriff and county attorney that he had not seen Orville Brown since he went to Indiana. He said he did this because he knew the officers had warrants for Orville and "I just didn't tell." Later he was asked on cross-examination, "Isn't it a fact you are related to

the Browns?" He replied, "I could be." When asked, "Isn't it a fact you are Orville Brown's nephew?" he replied, "Yes."

Mrs. Tom Press Brown, mother of Orville, said that Orville came to her home between nine and ten o'clock the morning the killing was done; that she was putting down a linoleum rug in her kitchen; that she heard two shots fired; that Orville and Carl Thomas were in her house with her at that time.

Appellant assigns as errors for reversal:

"(1) The court erred to prejudice of appellant's substantial rights in the admission of evidence over appellant's objection.

"(2) The court erred in failing to sustain appellant's motion to peremptorily instruct the jury to find him not guilty at the conclusion of all the evidence and because the verdict is against both the law and the evidence.

"(3) The court erred to appellant's prejudice in ordering to jail in the presence of the jury one Cleo Caudill, a witness for the Commonwealth, without explanation, when he supposedly failed to answer questions the same as testified to on previous trials.

"(4) Because the Commonwealth's attorney, in his closing argument, made certain inflammatory statements to the jury which were not supported by the evidence and calculated solely to inflame the passion and prejudice of the jury against the appellant."

Appellant's chief complaint is that the trial court permitted witnesses for the Commonwealth to state as their opinion that the masked gunman was Orville Brown.

In Foure v. Commonwealth, 205 Ky. 62, 265 S. W. 443, 445, this court said:

"If the witness knew who it was she saw, or some facts or circumstances upon which she could base a judgment as to who it was, she should be permitted to testify as to who the man was or who in her judgment it was * * *."

In Hogan v. Commonwealth, 212 Ky. 813, 280 S. W. 104, 105, we said:

"Crawford and his daughter * * * say that from the sound of his voice and general size, they recognized the intruder as Hogan, whom they had known for some time, although they could not see his face. Their testimony as to such identification was competent."

Here Arnold Johnson, who had known appellant all his life and spent much time with him, positively identified appellant from his voice, size and the way he held his shoulders as the killer. Likewise Russell Lowe, who had known appellant for many years, stated that it was his best judgment that the masked gunman was Orville Brown. Carl Maze, who had not known Brown so long, stated that to his best knowledge the voice of the gunman was the voice of Orville Brown.

Tootie Pennington, who testified for appellant, was asked, "In your opinion based upon your knowledge of Orville Brown's voice and build and size, in your opinion was that man that did that killing on that day Orville Brown?" He answered, "No, it was not." Counsel for appellant by his question recognized that identification in cases such as this is a matter of opinion based upon sufficient acquaintance and familiarity with the voice, appearance and characteristics of the person identified.

Objection was made to the testimony of Carl Maze because he had testified differently upon former trials of this case. The court properly instructed the jury that they could consider this evidence only for the purpose of affecting his credibility as a witness.

Appellant objects to the introduction of photographs of the deceased showing the surroundings at the place he was assassinated. It was shown that these photographs were true and correct representations of the scene of the tragedy shortly after the killing. Photographs are admissible as primary evidence upon the same grounds and for the same purposes as are diagrams, maps and drawings. Underhill's Criminal Evidence, 4th Edition, section 117.

Appellant objects to the testimony of John McDaniel who stated that the reputation of Carl Thomas, wit-

ness for appellant, for truth and veracity was "pretty bad" because McDaniel didn't know where Carl Thomas lived. On cross-examination McDaniel stated that Thomas "lived here and yon. Everybody on the ridge from Tom Press Brown's knows his reputation. I have heard them all talk. * * * It was country talk." Appellant's objection to this evidence was properly overruled.

Appellant complains because, he says, Cleo Caudill, a Commonwealth witness, was taken from the witness chair and removed to jail without explanation to the jury. We find, however, that Caudill was recalled on the second day of the trial and was asked, "When you testified yesterday will you tell the jury whether or not there was anything physically wrong with you?" He answered, "I was about half drunk." He was asked, "You are sober this morning?" and he replied, "Yes." This was a sufficient explanation to the jury of why he was removed from the stand.

Appellant complains that the Commonwealth's attorney said in his closing argument, "Eddie Johnson lost his life trying to protect little boys and girls from the ravages of moonshiners and bootleggers. He was a martyr." There is some evidence in this case as to the selling of liquor and it appears that Eddie Johnson was shot down at a time when he was unarmed and not attempting to injure anyone, and the motive suggested is that he, as a citizen, had been assisting in law enforcement. Commonwealth's attorneys, as we have often held, should confine their argument to the proof and reasonable inferences therefrom. Here the remark of the Commonwealth's attorney was not prejudicial to the substantial rights of the appellant.

The evidence was conflicting. The jury saw and heard the witnesses. The credibility of the witnesses is for the jury and this court will not disturb a verdict because the jury saw fit to believe one set of witnesses as against the other. The verdict in this case is not against the weight of the evidence. No error appearing prejudicial to any substantial rights of appellant, the judgment of the circuit court is affirmed.